**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| KETTNER INVESTMENTS, LLC,[1] | Case No. 20-12366 (KBO) |
| Debtor. | **Hearing Date: Oct. 13, 2020 at 1:00 p.m. (ET)**<br>**Objection Deadline: Oct. 6, 2020 at 4:00 p.m. (ET)** |

**MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING
THE DEBTOR'S USE OF CASH COLLATERAL, (II) FINDING THAT THE
PREPETION SECURED LENDERS ARE ADEQUATELY PROTECTED,
AND (III) CONFIRMING DEBTOR'S ABILITY TO SELL CERTAIN
SECURITIES IN THE ORDINARY COURSE OF BUSINESS**

Kettner Investments, LLC, the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby moves the Court (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (a) authorizing the Debtor's use of cash collateral, (b) finding that the Prepetition Secured Lenders (as defined herein) are adequately protected, (c) confirming the authority of the Debtor to continue to sell securities consistent with the terms of the DRIP Plan and in the ordinary course of business, and (d) granting such other relief as the Court may deem just and proper, pursuant to sections 105(a), 361, 363(b), 363(c)(1), 363(c)(2), and 507 of chapter 11 of title 11 of the United States Code, §§ 101–1532, as amended (the "Bankruptcy Code"). In support of this Motion, the Debtor relies upon and fully incorporates the *Declaration of James R. Arabia in Support of Debtor's Operational Motions* (the "Arabia Declaration"), filed concurrently herewith and respectfully represents as follows:

---

[1]     The Debtor in this chapter 11 case, together with the last four digits of each Debtor's federal tax identification number, is as follows: Kettner Investments, LLC, successor-by-merger to Stone Ash, LLC (Delaware), fka General Hemp LLC, and and fka Greater Hemp LLC (2258). The mailing address for the Debtor, solely for the purpose of notices and communications, is: 9625 Mission Gorge Road, No. B-2331, Santee, California 92071.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor consents to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

2.      Venue of this Chapter 11 Case[2] and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for relief requested herein are sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, Rules 2002, 4001, 6003, 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 4001-2.

## BACKGROUND

4.      On September 16, 2020 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code.

5.      The Debtor is authorized to continue to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in this Chapter 11 Case by the Office of the United States Trustee for Region 3 (the "U.S. Trustee").

---

[2]      All capitalized terms used but not defined herein shall have the meanings given in the Arabia Declaration.

6.      The Debtor is a privately held limited liability company which invests in and monetizes for profit and to cover its expenses its investments in certain companies, depending on market conditions. The Debtor's portfolio currently consists primarily of minority equity interests in  three portfolio companies, each involved in different aspects of the hemp industry and/or other industries, certain of which is a registered issuer of equity securities pursuant to the Securities Act of 1933, as amended, 15 U.S.C. § 77a *et seq.*, and a reporting company pursuant to the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a et seq. The three companies are Medical Marijuana, Inc. ("MJNA"),[3] Axim Biotechnologies, Inc. ("AXIM"), and Kannalife, Inc. ("KLFE"). Additional information regarding the Debtor's business operations, capital structure and primary indebtedness, and the events leading up to the commencement of this case is more fully set forth in the Arabia Declaration.

7.      In the ordinary course of its business, the Debtor routinely sells certain securities held by the Debtor in certain non-debtor entities, including shares of MJNA (shares thereof, the "MJNA Stock" and, collectively with the shares of AXIM and KLFE, the "Debtor Owned Securities").

8.      During the period immediately preceding the Petition Date, the Debtor primarily sold shares of MJNA Stock (and not shares of the other portfolio companies for business reasons, including that such companies were not yet at a point of development where the Debtor desired to sell the securities it holds therein).  Because the Debtor is considered an "affiliate" of MJNA pursuant to Rule 144(a)(1) of the 1933 Securities Act,[4] sales by the Debtor of MJNA Stock are

---

[3]      Despite its name, Medical Marijuana, Inc. is not involved in the marijuana industry; its business involves federal- and state-legal hemp products.

[4]      Rule 144(a)(1) provides: "An affiliate of an issuer is a person that directly, or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  1933 Act Regulation, 17 C.F.R. § 230.144(a)(1).

subject to certain limitations pursuant to, *inter alia*, section 78j of the Securities Act of 1934, Rule 144 under the Securities Act of 1933, and Rules 10b-5 and 10b5-1 under the Securities Act of 1934.[5]  Specifically, the Debtor may only sell MJNA Stock consistent with the terms of a "written plan for trading securities" under Rule 10b5-1(c)(1)(i)(A)(3) (the "<u>DRIP Plan</u>").  1934 Act Regulation, 17 C.F.R. § 240.10b5-1(c)(1)(i)(A)(3).[6]

9.      The Debtor's current DRIP Plan was entered into on January 13, 2020, as between the debtor and Wilson-Davis & Co., Inc., the Debtor's agent for selling purposes. Under the DRIP Plan, an amount of MJNA Stock equal to 1% of MJNA's total outstanding shares—or, as of the date hereof, approximately 36 million shares of MJNA Stock—must be sold by the Debtor at recurring 90-day intervals.  As of June 30, 2020, MJNA reported that there were approximately 3,866,316,936 total shares of MJNA Stock outstanding.[7]  Accordingly, under the current DRIP Plan, the Debtor may sell no more than approximately 38 million shares of MJNA Stock every 90 days.  Finally, the DRIP Plan provides that WDCO is to cease selling stock upon notice of the commencement of the bankruptcy by the Debtor, *see* DRIP Plan, § C.2(d);

---

[5]      1933 Act Regulation, 17 C.F.R. § 230.144(a)(1) (2020); *see* 15 U.S.C. § 78j(b); 1934 Act Regulations, 17 C.F.R. §§ 240.10b-5 & 240.10b5-1.

[6]      Rule 10b5-1(c)(1)(i)(A) provides an affirmative defense to the prohibition of the "purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer" under Rule 10b5-1(a) where: "Before becoming aware of the information, the person had: . . . (3) Adopted a written plan for trading securities."  1934 Act Regulation, 17 C.F.R. §§ 240.10b5-1(c)(1)(i)(A)(3); *see id.*, § 10b5-1(a).  Pursuant to Rule 10b5-1(c)(1)(i)(B), such plan must:

(1)  Specif[y] the amount of securities to be purchased or sold and the price at which and the date on which the securities [are] to be purchased or sold;

(2)  Include[] a written formula or algorithm, or computer program, for determining the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold; or

(3)  Did not permit the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales; provided, in addition, that any other person who, pursuant to the . . . plan, did exercise such influence must not have been aware of the material nonpublic information when doing so.

1934 Act Regulation, 17 C.F.R. § 240.10b5-1(c)(1)(i)(B).

[7]      *See* Medical Marijuana, Inc.'s Information and Disclosure Statement pursuant to Rule 15c2-(11)(a)(5); 1934 Act Regulation, 17 C.F.R. § 240.15c2-(11)(a)(5).

however, the Debtor believes it is in the best interest of the estate to direct WDCO to continue its brokerage activities, notwithstanding this provision.[8]

10.     Pursuant to section 10b5-1(c)(1)(i)(C), suspending or otherwise delaying the "amount, price, *or timing*" of the sale of MJNA Stock contemplated by the DRIP Plan may render the sale of the MJNA Stock under the DRIP Plan—including all past and future sales of the MJNA Stock—impermissible by rendering the DRIP Plan ineligible for the affirmative defense set forth in SEC Rule 10b5-1(c) or impracticable from the perspective of avoidance of disruption of an orderly market in MJNA stock.[9]

**A. The Debtor's Prepetition Capital Structure**

11.     The Debtor and TL-66, LLC ("TL-66" and, together with MJNA, the "Prepetition Secured Lenders") are parties to that certain Secured Promissory Note Purchase Agreement (the "Prepetition Note Purchase Agreement") and underlying Security Agreement, by and between General Hemp, LLC and TL-66, dated as of November 8, 2016.[10]  Under the Prepetition Note Purchase Agreement, the Debtor was entitled to seek the issuance of secured promissory notes to TL-66 (the "TL-66 Notes") of up to $10 million aggregate face value, with the first note (the "First TL-66 Note") in the amount of $1.93 million and subsequent notes to be issued at such times and in such amounts requested by the Debtor, subject to TL-66's right, in its sole

---

[8]      The Debtor reserves all rights with respect to the terms of the DRIP Plan, including, without limitation, whether Section C.2(d) of the DRIP Plan is an unenforceable *ipso facto* under 11 U.S.C. § 365(e)(1).

[9]      Rule 10b5-1(c)(1)(i)(C) provides an additional requirement for trading plans to qualify for the affirmative defense under SEC Rule 10b5-1(c), requiring that:

> [t]he purchase or sale that occurred was pursuant to the . . . plan.  A purchase or sale is not "pursuant to a . . . plan" if, among other things, the person who entered into the contract, instruction, or plan *altered or deviated from the contract, instruction, or plan* to purchase or sell securities (whether *by changing the* amount, price, or *timing of the purchase or sale*), or entered into or altered a corresponding or hedging transaction or position with respect to those securities.

1934 Act Regulation, 17 C.F.R. § 240.10b5-1(c)(1)(i)(C) (emphasis added).

[10] I serve as the president of TL-66, but hold no equity ownership stake in it.  TL-66 is owned by my spouse.

discretion, to decline to acquire subsequent notes.  Subsequent notes were issued as follows: for $287,500, dated January 27, 2017 (the "Second TL-66 Note"); for $325,000, dated January 31, 2017 (the "Third TL-66 Note'); for $220,000, dated February 17, 2017 (the "Fourth TL-66 Note"); for $2 million, dated March 8, 2017 (the "Fifth TL-66 Note"); for $5 million, dated June 20, 2017 (the "Sixth TL-66 Note"); and for $237,500, dated November 17, 2017 (the "Seventh TL-66 Note" and, together with the First, Second, Third, Fourth, Fifth and Sixth TL-66 Notes, the "TL-66 Secured Notes").  As of the Petition Date, there was approximately $4,154,983.90 million in principal and interest outstanding under the TL-66 Secured Notes issued pursuant to the Prepetition Note Purchase Agreement.   TL-66 has affirmatively consented to the release and proposed sale of at least 72 million MJNA collateral shares it has possession of as security for the TL-66 Secured Notes  and the use of the cash collateral related to the sale of such released collateral shares on the condition that the relief requested in the Operational Motions is granted. TL-66 contends that the TL-66 Notes are fully secured by liens on all, or substantially all, of the Debtor's assets.  As outlined in the Cash Management Motion, certain insignificant amounts of the Debtor's cash is currently held accounts maintained by Guy Street Financial Corporation and MM Holdings LLC for the benefit of TL-66 (such accounts, the "Control Accounts").  Other than the cash held in the Control Accounts, the Debtor does not believe that TL-66 has perfected its interest in the Debtor's Cash Collateral.

12.     Additionally, the Debtor and MJNA are parties to that certain Subordinated Secured Promissory Note, dated as of July 10, 2019 in the principal amount of $2,314,043.45 (the "MJNA Secured Note" and, together with the TL-66 Notes, the "Prepetition Secured Notes").  As of the Petition Date, there is approximately $2,412,231.96 in principal and interest outstanding under the MJNA Subordinated Note.  As of the Petition Date, on information and

belief, MJNA had not taken the actions necessary to perfect the liens granted under the MJNA

Subordinated Note, including with respect to the Debtor's Cash Collateral.

**B.     The Debtor's Need to Use Cash Collateral**

13.     The orderly continuation of the Debtor's efforts to preserve assets and maximize

the value of its estate is largely dependent upon its ability to regularly use cash collateral.

Without the liquidity provided by use of cash collateral, the Debtor's objective of maintaining

the value of its assets for the benefit of its creditors will fail without a fair opportunity to achieve

the purposes of the chapter 11 process.  As set forth in the Arabia Declaration, absent authority

to use cash collateral, the Debtor, its creditors, and the Debtor will be forced to immediately

cease conducting business, possibly rendering the Debtor unable to use the cash proceeds of

sales pursuant to the DRIP Plan, which in turn will harm the Debtor, its creditors and its

members in that, among other reasons, such sales may not later be made up due to applicable

securities laws and regulations.   Thus, the Debtor's access to cash collateral is absolutely

necessary to preserve and maximize value for the benefit of all of the Debtor's stakeholders.

14.     Without access to liquidity, the Debtor's ability to navigate through the chapter 11

process will be jeopardized, to the detriment of all of the estate's stakeholders. As a result, the

Debtor has an immediate need to use cash collateral to ensure liquidity at the outset of this

Chapter 11 Case.

15.     As demonstrated by the Budget, the Debtor has sufficient cash on hand or

anticipated cash flow to continue to pay expenses, such as management fees, professionals, and

other costs associated with ongoing operations without an immediate need for additional short-

term financing beyond use of cash collateral. The Budget contains categories of anticipated

disbursements during the time period that the Budget covers. The Debtor believes that the

Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with this Chapter 11 Case.

16.    The following chart contains a summary of the material terms of the Proposed Order, in accordance with Bankruptcy Rule 4001(b)(1) and Local Rule 4001-2.[11]

| Material Term: | Summary Description: |
|---|---|
| **Parties with an Interest in Cash Collateral:**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | TL-66, LLC<br><br>*See* Proposed Order, at ¶ C. |
| **Stipulations:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)*<br><br>*Local Rule 4001-2(a)(i)(B)* | The Debtor admits, stipulates, and agrees that: (i) as of the Petition Date there is at approximately $4,154,983.90 million in principal and interest outstanding under the Prepetition Note Purchase Agreement and the corresponding TL-66 Notes (the "Prepetition Secured Debt"); and (ii) the Prepetition Secured Debt is secured with valid, binding, enforceable, and perfected liens on substantially all assets of the Debtor (the "Prepetition Collateral"), *provided, however*, that TL-66 does not have valid, binding, enforceable, and perfected liens on any Cash Collateral that is not held in the Control Accounts or that is not in its possession.<br><br>*See* Proposed Order, at ¶ C. |
| **Budget and Permitted Variances:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | The use of cash collateral shall be in compliance with the Budget, a copy of which is annexed to the Proposed Order attached hereto as Exhibit A , subject to a weekly variance not to exceed 20% of the budgeted amounts of total cash disbursements for such week by category (including, but not limited to, the payment of fees or reimbursement of expenses to Debtor professionals) and in the aggregate.<br><br>*See* Proposed Order, at ¶ 2. |
| **Use of Cash Collateral:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | The Debtor is authorized to use Cash Collateral in accordance with the Budget and otherwise pursuant to the terms and conditions of the Proposed Order.<br><br>*See* Proposed Order, at ¶¶ 2 and 3. |

---

[11]    Capitalized terms used but not otherwise defined in this chart have the meanings ascribed to them in the Proposed Order.  The terms and conditions set forth in this Motion are qualified in their entirety by reference to the provisions of the Proposed Order.  Any summaries or descriptions in the chart are provided solely for the convenience of the Court and the parties in interest.  In the event of any inconsistency between the description of the terms of the Proposed Order and the descriptions in the chart, the actual terms of the Proposed Order shall govern.

| Material Term: | Summary Description: |
|---|---|
| **Maturity Date and Termination:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001- 2(a)(ii)* | The "Termination Date" is the earlier of (a) the occurrence of a "Termination Event", provided that TL-66 has not explicitly waived such Termination Event in writing; and (b) the effective date of a plan of reorganization or liquidation for the Debtor.  Following the Termination Date, absent further order of this Court, the Debtor shall no longer be authorized to use Cash Collateral.<br><br>*See* Proposed Order, at ¶ 2. |
| **Adequate Protection Lien/Superpriority Administrative Claim Status:**<br><br>*Bankruptcy Rule 4001(c)(1)(b)*<br><br>*Local Rule 4001- 2(a)(ii)* | -None- |
| **Automatic Perfection of a Lien:**<br><br>*Bankruptcy Rule 4001(c)(1)(vii)* | -None- |
| **Milestones:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(vi)* | -None- |
| **Events of Default:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001- 2(a)(ii)* | "Termination Events" for the Debtor's use of Cash Collateral are the following: (i) the conversion of this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; or (ii) appointment of a trustee or examiner in this Chapter 11 Case.<br><br>*See* Proposed Order, at ¶ 4. |
| **Adequate Protection:**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iv); and 4001(c)(1)(B)(ii)* | The Debtor does not propose to provide the Prepetition Secured Lenders with any additional adequate protection, other than adhering to the Budget. |
| **Carve Out:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | -None- |
| **Disparate Treatment of Professionals Under Carve-Out**<br><br>*Local Rule 4001- 2(a)(i)(F)* | -None- |

| Material Term: | Summary Description: |
|---|---|
| **Cross-Collateralization**<br><br>*Local Rule 4001- 2(a)(i)(A)* | -None- |
| **Modification of Automatic Stay:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | -None- |
| **Section 506(c) Waiver:**<br><br>*Local Rule 4001- 2(a)(i)(C)* | -None- |
| **Waiver of Marshaling Doctrine and Equities of Case Exception:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)*<br><br>*Local Rule 4001- 2(a)(i)(H)* | -None- |
| **Nonconsensual Priming Liens**<br><br>*Local Rule 4001- 2(a)(i)(G)* | -None- |
| **Lien on Avoidance Actions:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)*<br><br>*Local Rule 4001- 2(a)(i)(D)* | -None- |
| **Provisions Deeming Prepetition Debt to be Post-Petition Debt:**<br><br>*Local Rule 4001- 2(a)(i)(E)* | -None- |
| **Release, Waiver, or Limitation of any Estate Claim:**<br><br>*Bankruptcy Rule 4001(c)(1)(viii)* | -None- |
| **Indemnification:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | -None- |

**RELIEF REQUESTED**

17.     Pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rule 4001-2, the Debtor requests the entry of the Proposed Order substantially in the form attached hereto, (a) authorizing the Debtor's use of Cash Collateral, (b) finding that the Prepetition Secured Lenders are adequately protected in connection with the proposed use of Cash Collateral, to the extent so entitled, (c) authorizing the Debtor to continue to sell Debtor Owned Securities consistent with prepetition practices, including but not limited to the MJNA Stock pursuant to the DRIP Plan (except for Section C.2(d) of the DRIP Plan), and (d) granting such other relief as the Court may deem just and proper.

**I.     Debtor's Use of Cash Collateral**

18.     Section 363 of the Bankruptcy Code governs the Debtor's use of Cash Collateral.[12]  Under section 363(c)(2), a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes the use, sale or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

19.     Here, TL-66 consents to the Debtor's use of the Cash Collateral, provided, however, that, with respect to "securities", TL-66's consent is limited the 72 million shares of

---

[12]  Section 363(a) defines "cash collateral" as follows:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).  Notwithstanding the foregoing, and for purposes of clarity, the term "Cash Collateral" as used herein (or in the Proposed Order) does not include any of Debtor's securities held in TL-66's possession as of the Petition Date, except the Released Shares (defined below).

MJNA (the "Released Shares"), as described above. TL-66 acknowledges that the Debtor's ability to continue its asset preservation efforts and to administer this Chapter 11 Case in an orderly manner is dependent on its ability to fund the postpetition expenses set forth in the Budget. Use of the Cash Collateral is essential to the Debtor's ability to pay its expenses.

## II.    The Prepetition Secured Lenders are Adequately Protected

20.    A debtor's authority to use cash collateral is typically conditioned on providing "adequate protection" to entities that assert an interest in such cash. 11 U.S.C. § 363(e). "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in § 361." *In re Beker Indus. Corp*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Section 361 of the Bankruptcy Code contains a nonexhaustive list of acceptable forms of adequate protection. *See* 11 U.S.C. § 361.

21.    The principal purpose of adequate protection "is to assure that the lender's economic position is not worsened because of the bankruptcy case." *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006). A secured creditor is "not entitled to adequate protection payments without a showing of economic depreciation." *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994) (citing *United Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 369-73 (1988)). The interest in property that is entitled to protection is value of the collateral securing such claim. *Id.* It follows therefore that where a secured creditor's interest and the value of the collateral is not diminishing by its use, sale or lease, the secured creditor's interest is adequately protected. *Id.*

22.    The Bankruptcy Code does not explicitly define adequate protection, but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including other relief resulting in the indubitable equivalent of the secured creditor's interest in

12

such property. *See* 11 U.S.C. § 361. Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. *See*, *e.g.*, *In re Swedeland Dev. Grp. Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *In re O'Connor*, 808 F.2d 1393, 1396–97 (10th Cir. 1987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1995) (same); *In re Senior Care Props., Inc.*, 137 B.R. 527, 528 (Bankr. N.D. Fla. 1992) (same); *In re Family Place P'ship*, 95 B.R. 166, 171 (Bankr. E.D. Cal. 1989); *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *see also* S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978) and H.R. Rep. No. 595, 95th Cong., 2d Sess. 339 (1978) (acknowledging that the statute confers upon "the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved.").

23.    Preserving the value of the collateral against the decline in value that would result from a precipitous liquidation is a crucial factor to consider in making an adequate protection determination. *In re Snowshoe Co. Inc.*, 789 F.2d 1085, 87 (4th Cir. 1986) (affirming 364(d) financing order where trustee reported that the collateral would lose from 50% to 90% of its value if operations ceased); *In re Ralar Distribs., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994), *aff'd* 182 B.R. 81 (D. Mass.), *aff'd* 69 F.3d 1200 (1st Cir. 1995).

24.    In this Chapter 11 Case, TL-66 is adequately protected because without the Debtor's use of the cash collateral, it is extremely unlikely that the Debtor can remain in business and successfully reorganize. Moreover, TL-66 has consented to the use of cash collateral and the Debtor will comply with the Budget and shall not make any disbursements other than pursuant to the Budget, subject to applicable variances.

25.    Additionally, courts have found a secured creditor to be adequately protected where a sufficient equity cushion in the collateral exists. *See In re May*, 169 B.R. 462 (Bankr.

S.D. Ga. 1994); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D. N.J. 1993); *In re S.W. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).  Here, given the substantial value of the Debtor's assets compared to the amounts outstanding on the TL-66 Secured Notes and the associated Prepetition Note Purchase Agreement, the Debtor submits that TL-66 is substantially over-secured and adequately protected by the equity cushion alone.

26.     Thus, the Debtor submits that the proposed use of Cash Collateral is fair and reasonable under the circumstances, satisfies the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and is in the best interest of the Debtor, its estate, and all parties in interest.  Under the circumstances of this Chapter 11 Case TL-66 is adequately protected, as evidenced by, among other factors, the fact that TL-66 has consented to the use of the cash collateral on such terms.

27.     Finally, the Debtor submits that, because MJNA has not taken the steps necessary to perfect any asserted security interest in the Debtor's assets, including Cash Collateral, MJNA is not entitled to any adequate protection in connection with the proposed use of Cash Collateral.

**III.    The Debtor Is Authorized to Continue Selling Securities Pursuant to the Terms of the DRIP Plan and Otherwise In the Ordinary Course of Business.**

28.     Section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to section 1108 of the Bankruptcy Code to "enter into transactions, ***including the sale or lease of property of the estate***, in the ordinary course of business, without notice of a hearing." 11 U.S.C. § 363(c)(1).

29.     The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without undue oversight by creditors or the court. *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured*

*Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y 1997); *In re Enron Corp.*, 2003 Bankr. LEXIS 2111 (Bankr. S.D.N.Y. Mar. 21, 2003).

30.     Here, sales of the Debtor Owned Securities are the central business purpose for which the Debtor was formed and are the Debtor's core and substantially only revenue-generating business activity.  In particular, as of the Petition Date, the sale of MJNA Stock pursuant to the DRIP Plan is the primary focus of the Debtor's business, accounting for the substantial majority of the Debtor's revenues during the period preceding the Petition Date.

31.     Accordingly, the Debtor submits that entry of the Proposed Order, confirming that the Debtor may continue to sell the Debtor Owned Securities, including the MJNA Stock, consistent with prepetition practices and in the ordinary course of business under Bankruptcy Code section 363(c)(1).

### IV.     Continuing Sales of the MJNA Stock Under the DRIP Plan Is A Reasonable Exercise of the Debtor's Business Judgment

32.     If the Court finds that the Debtor's sale of the Debtor Owned Securities is not consistent with prepetition practices or the sale of the MJNA Stock pursuant to the DRIP plan is beyond the ordinary course of the Debtor's business, the Court should nevertheless authorize the continuation of the Debtor's sales of Debtor Owned Securities, including the MJNA Stock, consistent with prepetition practices, and under section 363(b) of the Bankruptcy Code, which authorizes the Debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing.  11 U.S.C. § 363(b)(1).

33.     Courts routinely hold that transactions should be approved under section 363(b) when they are supported by the reasonable business judgment of the debtor's management.[13]

---

[13]     The business judgment rule has ongoing vitality in chapter 11 cases.  *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615-616 (Bankr. S.D.N.Y. 1986) ("The Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

*See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as there is a legitimate business justification); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (same); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting the standard for determining a section 363(b) motion is "a good business reason").

34.    The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule is satisfied "when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville*

*Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts have consistently and appropriately been reluctant to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *Integrated Res.*, 147 B.R. at 656.

35.    The Debtor submits that continuing the sales of the MJNA Stock pursuant to the DRIP Plan and consistent with the "amount, price, and timing"[14] requirements for such sales therein represents a sound exercise of the Debtor's business judgment. Accordingly, to the extent the sales of MJNA Stock under the DRIP Plan are outside the ordinary course of business, they are justified under Bankruptcy Code section 363(b).

36.    If the Debtor is not permitted to continue sales of the Debtor Owned Securities consistent with prepetition practices, including sales of the MJNA Stock pursuant to the DRIP Plan, the effect will be that the Debtor is substantially prevented from operating its business in any capacity.  Further, in light of applicable federal securities laws and regulations, the Debtor's failure to continue sales of MJNA Stock consistent with the "amount, price, and timing" required under the DRIP plan could jeopardize the Debtor's future ability to sell MJNA Stock, whether under the DRIP Plan or otherwise, and whether in the context of this Chapter 11 Case or outside of bankruptcy.  *See* Rule 10b5-1(c)(1)(i)(C) under the Securities Act of 1934, 17 C.F.R. § 240.10b5-1(c)(1)(i)(C) (conditioning availability of the "trading plan" affirmative defense safeharbor outlined under Rule 10b5-1(c)(1)(i)(B) and rendering such defense inapplicable to the sale of securities under otherwise compliant trading plans  "if, among other things, he person who entered into the contract, instruction, or plan ***altered or deviated from the contract,***

---

[14]    *See generally* 1934 Act Regulations, 17 C.F.R. § 240.10b5-1(c)(1)(i)(C).

*instruction, or plan* to purchase or sell securities (whether *by changing the* amount, price, or *timing of the purchase or sale* . . . .").

37.     Finally, absent (a) confirmation by the Court that the sales of MJNA Stock under the DRIP Plan are permissible ordinary course transactions or (b) entry of an order authorizing the Debtor to continue the sales of MJNA Stock under Bankruptcy Code section 363(b)(1), the Debtor's relationship with the broker-dealer engaged prior to the Petition Date to execute such sales prior to the Petition Date will be irreparably damaged.  If, as a result, the Debtor is unable to secure the services of such broker-dealer for future sales of MJNA Stock under the DRIP Plan or any other "plan" under Rule 10b5-1(c), the Debtor's ability to execute future sales of its shares of MJNA Stock,[15] whether during the pendency of this Chapter 11 Case or outside of bankruptcy, will be significantly jeopardized, if not rendered impossible, threatening to vitiate the Debtor's ability to generate revenue and rendering the MJNA Stock—an asset of substantial value, but only if if sales continue under the DRIP Plan—substantially worthless to the Debtor and its estate.

38.     In light of the above, continuation of the sales of the Debtor Owned Securities, including the MJNA Stock under the DRIP Plan, falls within the sound business judgment of the Debtor and will benefit, and in no way prejudice, the Debtor's creditors by preserving the value of the Debtor's estate.  Accordingly, if the Court finds that sales of the Debtor Owned Securities and/or the sales of MJNA Stock under the DRIP Plan are outside of the ordinary course of the Debtor's business, the Court should authorize the sales under Bankruptcy Code section 363(b)(1).

---

[15]     As of the Petition Date, the Debtor owned approximately 470 million shares of outstanding MJNA Stock.

**V.      Continued Sales of the Debtor Owned Securities, Including the MJNA Stock, Is Necessary and Appropriate Under Bankruptcy Code Section 105(a)**

39.      The Court may exercise its equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Continuing the sales of MJNA Stock without interruption is vital to the Debtor's survival. The sale of MJNA Stock is the mechanism by which the Debtor generated substantially all revenue during the period immediately preceding the Petition Date.  Further, continuing the sale of MJNA Stock pursuant to the DRIP Plan is critical to the Debtor's ability to operate in any capacity whether in the context of this Chapter 11 Case or outside of bankruptcy.  It is well within the Court's equitable power under section 105(a) to approve the continued sales of the MJNA Stock under the DRIP Plan.

40.      The Debtor's ability to continue the sales of MJNA Stock pursuant to the "amount, price, and timing" requirements set forth in the DRIP Plan is critical to the ongoing operation of their businesses, as discussed above, and therefore necessary to maximize—and, in fact, preserve—the value of the Debtor's estate. As noted above, any interruption of the sales of MJNA Stock pursuant to the DRIP Plan could jeopardize the safe-harbor exemption of the sales from certain insider-trading prohibitions applicable to the sales under federal securities laws and regulations by nature of the Debtor's status as an "affiliate" of MJNA.  Further, such interruption creates a significant risk that the Debtor will be unable to continue executing the sales of MJNA Stock through the broker-dealer engaged in connection with such sales prior to the Petition Date, thereby inhibiting, if not rendering impossible, the Debtor's ability to execute any future sales of the MJNA Stock, whether permitted under the DRIP Plan or any later-developed plan that may qualify for the safe harbor under Rule 10b5-1(c).  Thus, interrupting, even temporarily, sales of

the MJNA Stock under the DRIP Plan will significantly diminish the value of the Debtor's estate.

41.     Further, a debtor operating its businesses as a debtor in possession under Bankruptcy Code sections 1107(a) and 1108 is a fiduciary "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty to "protect and preserve the estate, including an operating business's going-concern value."  *Id.*

42.     Finally, for the reasons set forth in more detail above, the Debtor's failure to continue the sales of MJNA Stock pursuant to the terms of the DRIP Plan could constitute grounds for conversion or dismissal of this Chapter 11 Case.  *See* 11 U.S.C. § 1112(b)(4)(A) ("cause" for dismissing a case on motion of a party in interest under section 1112(b)(1) of the Bankruptcy Code exists where there is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"); *supra*, ¶¶ 36-37.

43.     Based on the foregoing, the Debtor respectfully submits that entry of the Proposed Order confirming that the Debtor is authorized to sell Debtor Owned Securities consistent with prepetition practices, including the MJNA Stock under the DRIP Plan, is necessary and appropriate.

**VI.     Relief Under Bankruptcy Rule 6004(h) is Appropriate**

44.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Pursuant to Local Rule 6004-1(b)(iv)(O), the Debtor requests that the Court waive the 14 day stay period under Bankruptcy Rule 6004(h).  Timely confirmation of the

Debtor's authority to continue with its prepetition practices is necessary, among other reasons, to reassure the third-parties whose services are necessary to execute the sale of MJNA Stock that such sales are legally permissible during the pendency of this Chapter 11 Case to the full, complete, and same extent they were prior to the Petition Date.

## NOTICE

45.     The Debtor will provide notice of this Motion to: (i) the U.S. Trustee; (ii) holders of the 20 largest unsecured claims against the Debtor; (iii) TL-66, LLC, in its capacity as lender under the TL-66 Secured Notes; (vi) Medical Marijuana, Inc., in its capacity as lender under the MJNA Secured Note; and (v) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor respectfully submits that no further notice of this Motion is required.

*Remainder of page intentionally left blank.*

## **CONCLUSION**

The Debtor respectfully requests that this Court enter an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtor's use of cash collateral and granting such other and further relief as the Court deems just and proper.

Dated:    September 25, 2020

BAYARD, P.A.

*/s/ Daniel N. Brogan*
Neil B. Glassman (No. 2087)
GianClaudio Finizio (No. 4253)
Evan T. Miller (No. 5364)
Daniel N. Brogan (No. 5723)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: nglassman@bayardlaw.com
       gfinizio@bayardlaw.com
       emiller@bayardlaw.com
       dbrogan@bayardlaw.com

*Proposed Counsel for the Debtor*