**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>KETTNER INVESTMENTS, LLC,[1]<br><br>Debtor | Chapter 11<br><br>Case No. 20-12366 (KBO) |

**DECLARATION OF JAMES R. ARABIA
IN SUPPORT OF DEBTOR'S OPERATIONAL MOTIONS**

1.      I have been unanimously designated by the Executive Committee (defined below) as Chief Restructuring Representative of Kettner Investments, LLC, as debtor and debtor in possession (the "Debtor" or "Kettner") in the above-captioned chapter 11 case (the "Chapter 11 Case").

2.      My professional background includes significant experience in management and financing of public companies including service as a CEO, addressing debtor/creditor relations, with expertise in clearing shares of micro-cap companies and the securities regulations involved with that process. I've also served as Co-Chairman and Chairman of Official Committees of Equity Holders in two Chapter 11 bankruptcies in the Northern District of Texas.

3.      I am a member of the Debtor, have served as a consultant to Kettner since 2014, and have served as its duly-appointed litigation liaison since early 2018. As a result of the commencement of this Chapter 11 Case, the managers unanimously appointed me as Chief Restructuring Representative because of my professional experience to assist them in the discharge of their duties in connection with the Chapter 11 Case, including provision of relevant

---

[1] The Debtor in this chapter 11 case, together with the last four digits of each Debtor's federal tax identification number, is as follows: Kettner Investments, LLC, f/k/a Stone Ash LLC, General Hemp LLC, and Greater Hemp LLC (2258). The mailing address for the Debtor, solely for the purpose of notices and communications, is: 9625 Mission Gorge Road, No. B-2331, Santee, California 92071.

information to all constituents and the Court, and because of my familiarity with the history of the Debtor, its current situation, and the various pending litigation matters.

4. I am generally familiar with the Debtor's day-to-day operations, business, legal and financial affairs. I submit this declaration (this "Declaration") in connection with: (a) the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on September 16, 2020 (the "Petition Date") and (b) the relief requested by the Debtor pursuant to the *Motion of the Debtor for Entry of an Order (I) Authorizing the Debtor's Use of Cash Collateral, (II) Finding that the Prepetition Secured Lenders are Adequately Protected, and (III) Confirming Debtor's Ability to Sell Certain Securities in the Ordinary Course of Business* (the "Cash Collateral Motion") and the *Motion of the Debtor Seeking Entry of an Order  (I) Authorizing the Debtor to (A) Continue to Operate Its Cash Management System and (B) Continue to Use Existing Checks and Business Forms, and (II) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) and the United States Trustee Operating Guidelines* (the "Cash Management Motion" and, together with the Cash Collateral Motion, the "Operational Motions").

5. Except as otherwise indicated, all facts and statements set forth in this Declaration are based upon (a) my personal knowledge or opinion, (b) information obtained from members of the Debtor's management team, accountants or advisors, (c) the Debtor's books and records maintained in the ordinary course of its business, or (d) my review of relevant documents and information concerning the Debtor's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.

6. I submit this declaration in support of the Operational Motions and pursuant to 28 U.S.C. § 1746.  If called upon to testify, I could and would testify competently to the statements

set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge.

## I. GENERAL BACKGROUND

### A. Debtor Overview and Business Operations

7.  The Debtor is a Delaware LLC formed on February 7, 2018. Effective March 7, 2018, General Hemp, LLC, which was subsequently renamed Stone Ash, LLC ("Stone Ash Delaware") was merged with and into the Debtor (the "Merger") with the Debtor remaining the surviving entity.

8.  Kettner is a long-term equity investor in companies engaged in the legal hemp industry and pharmaceutical drug and medical tests development, including, among others, AXIM's (defined below) in-development test for the COVID-19 virus. Notably, none of Kettner's portfolio companies is engaged in either the medical or recreational marijuana business, and, therefore, the operations of each of Kettner's portfolio companies are lawful business enterprises under state and federal law.[2] Kettner's portfolio currently consists of equity stakes in three publicly traded microcap companies as follows:[3]

- Medical Marijuana, Inc. ("MJNA") of which Kettner holds approximately 470 million shares, at a current market value of approximately $6.393 million ($0.0136 cents per share), constituting approximately 12.16% of the issued and outstanding common stock.[4]

---

[2] In May of 2020 AXIM divested itself of its legal hemp business and (other than a patent application filed by AXIM's wholly-owned subsidiary, Sapphire Biotech, Inc. in relation to water-soluble cannabinoid molecules for prospective use in pharmaceutical drug development) has no business operations in legal hemp or cannabis. Its operations are primarily related to research and development of testing and treatment in the fields of oncology and antibody testing for COVID-19. KLFE also has no marijuana-related business and is a phytomedical/pharmaceutical company that specializes in the research and development of synthetic molecules and therapeutic products derived from botanical sources.

[3] Kettner does hold a number of loans receivable, the collectability of which is not certain.

[4] Despite its name, as noted MJNA is not engaged in either the medical or recreational marijuana business.

- Axim Biotechnologies, Inc. ("AXIM") of which Kettner holds 3,098,909 shares, at a current market value of approximately $1.94 million ($.6249 per share), constituting approximately 2.62% of the issued and outstanding common stock.

- Kannalife, Inc. ("KLFE"), of which Kettner holds 6,817,067 shares, at a current market value of approximately $5.45 million ($.80 per share), constituting approximately 9.18% of the issued and outstanding common stock.

9. Occasionally, in its discretion and as it deems necessary and advisable, Kettner makes capital investments into its portfolio companies in order to advance their development and increase their value. Additionally, it may occasionally provide strategic and operational advisory services to its portfolio companies. Unfortunately, all three portfolio companies have suffered significant declines in value following the peak of the stock bubble for cannabis and cannabis-related businesses (e.g. businesses relating to hemp) in early 2019, whereby such stocks have declined by as much as 85 to 90% from their highs.[5] Currently, with the exception of MJNA, which is at or near cash flow break even, the portfolio companies have significant capital needs which can currently only be met by their ability to raise capital by selling equity or issuing debt securities that convert into equity. Unnecessary selling pressure in the stocks of these companies makes it more difficult for them to raise capital at a reasonable cost. AXIM and KLFE, in particular, are very early development companies with significant monthly cash burn rates and large capital needs in order to fund their business plans and development needs.

10. Kettner is a manager-managed LLC, managed by a three-member executive committee (the "Executive Committee"), which has authority over virtually all of the affairs of

---

[5] Although AXIM divested itself of legal hemp operations in May of 2020, the share price had already collapsed following the cannabis bubble. KLFE did not begin trading as KLFE until December of 2019; prior to that time it traded as TYG Solutions Corp., a company with limited operations and no trading volume for its stock.

the Company (each member of the Executive Committee is deemed a manager). The current Executive Committee is comprised of Dr. Stuart W. Titus, Dr. Timothy R. Scott and John W. Huemoeller II. In addition to their positions on the Executive Committee: Dr. Titus serves as the Chairman and CEO of MJNA, the Company's most-valuable portfolio holding; Dr. Scott sits on the Board of Directors of MJNA, AXIM and KLFE; and Mr. Huemoeller is the Chairman and CEO of AXIM.[6]

11. In the ordinary course of its business and in order to realize operating revenue, the Debtor routinely sells portions of its interests in the portfolio companies pursuant to a 10b5-1 Sales Plan ("DRIP Sales"). The smaller the Debtor's operating cash needs are, the more flexible the Debtor can be in deciding if and when to sell off portions of its portfolio companies. During the period immediately preceding the Petition Date, the Debtor primarily sold shares of MJNA Stock. Because certain of the Debtor's portfolio companies are its sole readily marketable assets, the Debtor's sole source of revenue is the periodic, ordinary course sale of certain of its holdings in the portfolio companies.[7]

## II. THE DEBTOR'S CAPITAL STRUCTURE

### A. Secured Debt

12. The Debtor and TL-66, LLC ("TL-66" and, together with MJNA, the "Prepetition Secured Lenders") are parties to that certain Secured Promissory Note Purchase Agreement (the "Prepetition Note Purchase Agreement") and underlying Security Agreement, by and between

---

[6] All three managers were involved with Kettner's portfolio companies before the untimely death of Michael Llamas. They served on the Boards of MJNA and/or AXIM prior to his death.

[7] Currently, the managers have determined to sell only shares of MJNA in order to meet operating needs (there is very little liquidity in the KLFE position at this time even if there was a desire to sell). Investment decisions are made by the Executive Committee, and decisions in regard to the timing of the sale of portfolio company holdings is vested in a Special Committee comprised of Dr. Scott and Mr. Huemoeller.

General Hemp, LLC and TL-66, dated as of November 8, 2016.[8] Under the Prepetition Note Purchase Agreement, the Debtor was entitled to seek the issuance of secured promissory notes to TL-66 (the "TL-66 Notes") of up to $10 million aggregate face value, with the first note (the "First TL-66 Note") in the amount of $1.93 million and subsequent notes to be issued at such times and in such amounts requested by the Debtor, subject to TL-66's right, in its sole discretion, to decline to acquire subsequent notes.  Subsequent notes were issued as follows: for $287,500, dated January 27, 2017 (the "Second TL-66 Note"); for $325,000, dated January 31, 2017 (the "Third TL-66 Note'); for $220,000, dated February 17, 2017 (the "Fourth TL-66 Note"); for $2 million, dated March 8, 2017 (the "Fifth TL-66 Note"); for $5 million, dated June 20, 2017 (the "Sixth TL-66 Note"); and for $237,500, dated November 17, 2017 (the "Seventh TL-66 Note" and, together with the First, Second, Third, Fourth, Fifth and Sixth TL-66 Notes, the "TL-66 Secured Notes").  As of the Petition Date, there was approximately $4,154,983.90 million in principal and interest outstanding under the TL-66 Secured Notes issued pursuant to the Prepetition Note Purchase Agreement.   TL-66 has affirmatively consented to the release and proposed sale of at least 72 million MJNA collateral shares it has possession of as security for the TL-66 Secured Notes and the use of the cash collateral related to the sale of such released collateral shares on the condition that the relief requested in the Operational Motions is granted. TL-66 contends that the TL-66 Notes are fully secured by liens on all, or substantially all, of the Debtor's assets.

13.    Additionally, the Debtor and MJNA are parties to that certain Subordinated Secured Promissory Note, dated as of July 10, 2019 in the principal amount of $2,314,043.45 (the "MJNA Secured Note" and, together with the TL-66 Notes, the "Prepetition Secured

---

[8] I serve as the president of TL-66 but hold no equity ownership stake in it.  TL-66 is owned by my spouse.

Notes"). As of the Petition Date, there is approximately $2,412,231.96 in principal and interest outstanding under the MJNA Subordinated Note. It is my understanding that, as of the Petition Date, MJNA had not taken the actions necessary to perfect the liens granted under the MJNA Subordinated Note.

### B.  Unsecured Debt

14.  The Debtor's unsecured debt stems from a variety of sources, including notably (i) the significant professional costs incurred as a result of the Probate Administrator's (as defined below) extensive litigation campaigns involving the Debtor either directly or indirectly; and (ii) the disputed claim asserted by Columbia & Beech Corporation. Inclusive of disputed claims, the Debtor estimates its unsecured debt to total approximately $11.6 million. Notably, however, the amounts owed to trade creditors are *de minimis*.

### C.  Equity

15.  As of the Petition Date, the Debtor had 531 units of membership interest issued and outstanding, which are held by the following five members: (i) the Estate of Michael Robert Llamas (the "Probate Estate") holds 450 units; (ii) Stuart W. Titus (who, again, is also a manager of the Debtor) holds 50 units; (iii) TL-66 holds 29 units; (iv) John W. Huemoeller II holds 1 unit (and is also a manager); and (v) I hold 1 unit.

### III. EVENTS LEADING UP TO THE CHAPTER 11 CASE

16.  The Debtor's ultimate bankruptcy filing was precipitated by a number of factors, including notably the precipitous (85-90%) decline in the value of its portfolio holdings following the peak of the cannabis-stock bubble in early 2019. Another significant factor necessitating the commencement of this Chapter 11 Case is the vexatious, scorched earth litigation strategy fomented on all fronts by the administrator of the Probate Estate (the "Probate

Administrator") appointed following the untimely death, without a will, of the Debtor's former majority owner. The Debtor's Chapter 11 filing will allow it to continue its business operations and maximize value for all stakeholders by (a) affording the Debtor the necessary "breathing room" to continue to manage its portfolio free from circumstances that might require the injudicious liquidation of shares held in its portfolio companies; (b) keeping the Debtor's existing management intact such that its business can continue to benefit from the stewardship of the individuals who know the business of Debtor's portfolio companies the best and who have ample necessary industry experience; and (3) halting the serial pursuit of litigation by the Probate Administrator who is without any supporting constituency and whose actions against the Debtor fail to serve the best interests of the sole beneficiary of the Probate Estate, as discussed more below.

17.     **The Stone Ash California Action**: In January 2018 Debtor and Stone Ash, LLC, a California limited liability company ("Stone Ash California"), an affiliate of the Debtor under the control of Decedent's sister-in-law, an employee of Debtor, initiated suit against one another in California state court in the action styled *Stone Ash, LLC (California) v. Stone Ash, LLC (Delaware), et al.*, San Diego Superior Court Lead Case No. 37-2018-00003662-CU-BT-CTL, seeking adjudication of ownership of some $9.8 million in stock sale proceeds belonging to Debtor which Stone Ash California received and held as nominee for Debtor. The action is still pending. Debtor seeks confirmation that the proceeds are company funds. Stone Ash California claims the funds were a "gift" to "the Llamas family." On or about April 8, 2019, the Probate Administrator filed a new action in California state court against Stone Ash California and others, claiming that the $9.8 million at issue was neither the Debtor's money nor a gift, but rather an LLC member distribution to Decedent (and thus property of the Probate Estate). Stated

differently, the Probate Administrator injected herself into the dispute to try to recover directly the same monies already at issue between the Debtor and Stone Ash California, converting the dispute into a *three-way* contest over the monies (the Administrator's entry into the Stone Ash action dramatically increased the cost to litigate the case for all parties involved). [9] This new action was consolidated into the already-pending action between the Debtor and Stone Ash California.[10]

18.  **The Premium Produce Action**: In early 2018 the Debtor and Premium Produce LLC filed suit against one another in California state court in the action styled *Premium Produce LLC v. Kettner & Grape, Inc., et al.*, San Diego Superior Court Case No. 37-2018-00005916-CU-BT-CTL, which involves a dispute over the nature and terms of a $5.13 million investment originating with Debtor. The action is still pending. Like with the Stone Ash California Action, the Probate Administrator injected herself into this action, filing a Complaint-in-Intervention claiming that the $5.13 million comprised an LLC member distribution to Decedent, and that any corresponding interest in the investment belonged to the Probate Estate.

19.  **The Delaware Control Action:** On July 16, 2018, Decedent's father and brother (Jeffery and Steven Llamas) commenced an action, captioned *Llamas v. Titus, et al.,* C.A. No. 2018-0516-JTL (the "Delaware Control Litigation") in the Court of Chancery of the State of Delaware, in which Jeffery and Steven Llamas asserted that they (and not the Debtor's current managers) were the proper managers of Stone Ash Delaware (the Debtor's predecessor prior to the Merger). Following a year of litigation, nearly $2 million in litigation expenses incurred by

---

[9] Notably, the Estate directly or indirectly pays for all three side's legal fees.

[10] On or about May 22, 2019, Stone Ash California filed a Cross-Complaint against the Probate Administrator for fraud in connection with a $1 million loan made to the Probate Administrator by Stone Ash California.

the Debtor, and a one-day bench trial, the Court of Chancery rendered final judgment that Jeffery and Steven Llamas were never validly appointed as managers of Stone Ash Delaware, and that "[s]ince November 7, 2017, the managers of Kettner Investments, LLC f/k/a Stone Ash, LLC f/k/a General Hemp, LLC have been Stuart W. Titus, John W. Huemoeller and Timothy R. Scott." Court of Chancery Final Judgment, at ¶ 1, a copy of which is attached hereto as <u>Exhibit A</u>, along with the Court of Chancery's June 18, 2019 Opinion.

20. **The Advances Action**: On November 2, 2018, the Debtor filed suit against the Probate Administrator in California state court in the action styled *Kettner Investments, LLC, et al. v. Kriebel*, San Diego Superior Court Case No. 37-2018-00056184-CU-BC-CTL, seeking enforcement of Debtor's probate creditor claim for approximately $8.3 million in loans/advances against future distributions provided to Decedent during his lifetime.

21. On August 20, 2019, on the eve of a planned global mediation involving all parties to the various California actions, the Probate Administrator filed a Cross-Complaint in the Advances Action against Debtor's three managers, me, and TL-66 (collectively, "Cross-Defendants"), asserting claims, among others, for contractual interference, breach of fiduciary duty, and conversion. The Cross-Complaint triggered Debtor's contractual duties of defense and indemnification in favor of Cross-Defendants and, prepetition, the Debtor funded Cross-Defendants' defense in the action.

22. Recently, as part of her inappropriate pressure strategy, the Probate Administrator has made efforts to try to circumvent the Court of Chancery's final judgment in the Delaware Control Action by asking the California court in the Advances Action to issue an order that would *directly* contradict the final judgment entered by the Court of Chancery. Specifically, on August 10, 2020, the Probate Administrator filed an *ex parte* motion in the Advances Action

requesting issuance of a temporary restraining order ("TRO") and an order to show cause re a preliminary injunction restraining the Debtor from continuing the sales of its assets and from making distributions or paying its ordinary course business expenses. The Probate Administrator's motion, and underlying claims, seek to relitigate the same control issues that were concluded decisively in the Delaware Control Action. Ultimately, the TRO request was denied. However, subsequently, and to the Debtor's great surprise, the California court in the Advances Action *sua sponte* issued an order requiring the Debtor to appear on September 17, 2020 and show cause why a receiver should not be appointed. In addition, also *sua sponte*, the court prevented the Debtor from paying any legal fees, including for the indemnified Cross-Defendants. This left Debtor in a position that made it impossible to conduct its business and prosecute and defend the multiple pending litigation matters. A copy of the court's order to show cause is attached hereto as Exhibit B. Issuance of the order to show cause was the final straw that pushed the Debtor into filing this Chapter 11 Case.

23. The Debtor, however, is not the only party in interest fed up with the Probate Administrator's wasteful and seemingly endless campaign of litigation involving the Debtor and its management. Indeed, in a declaration filed in opposition to the Probate Administrator's TRO motion, the mother and legal guardian of Decedent's minor daughter, who is the sole heir of the Probate Estate, represented that she has demanded the immediate resignation of the Probate Administrator, and staunchly opposes her attempts to gain control of the Debtor. *See* Declaration of Krista Llamas, a copy of which is attached hereto as Exhibit C. Indeed, Ms. Llamas's declaration explains that the Probate Administrator is "engaging in multiple wasteful, pointless, litigation cases which are actually devaluing the Estate assets which should properly be [the heir's] property" and that "[b]ecause of the [Probate Administrator]'s incessant and wasteful

11

spending, underhanded behavior, and refusal to disclose the reason for pursuing numerous expensive lawsuits," Ms. Llamas is concerned that "the assets which should be marshaled for [the heir]'s benefit will instead be dissipated so that [the heir] ends up with nothing." Ex. E, at ¶¶ 5 and 8.

24. The Probate Administrator's actions as summarily detailed above all appear to have the same goal in mind: payments to the Estate, as an equity owner of the Debtor, at the expense of Debtor's creditors all while the Probate Administrator, and her professionals, are first in priority to be paid from Probate Estate monies.

25. Notably, other than the Probate Administrator, the Debtor is not aware of a single creditor or interest holder who is supportive of authority over the entity being vested in anyone other than the current managers.[11] Also, news of the actions taking place against the Debtor and its managers, and the potential of a stranger to this Debtor and its portfolio companies being vested with authority and control has resulted in nervous reverberations through the portfolio companies and key personnel within those companies. The portfolio companies have various key employees that could easily seek alternative employment, to the substantial detriment of Debtor and the portfolio companies, if the acrimony surrounding Kettner - all emanating from the Probate Administrator – continues.

26. Therefore, based on the above circumstances, and to prevent the further destruction of its value by the Probate Administrator, the Debtor made the difficult determination that the filing of this Chapter 11 Case was in the best interests of the Debtor and its stakeholders.

---

[11] As noted above, although the Probate Administrator and the Debtor have a strained relationship, Krista Llamas, the guardian and mother of the 8-year old ultimate recipient of the 450 Units owned by the Probate Estate has a good working relationship with the Debtor.

27.     The Debtor seeks to use the Chapter 11 process to reorganize its debts. To that end, the automatic stay triggered upon the filing of this Chapter 11 Case will provide a necessary reprieve from persistent litigation matters and allow the Debtor to focus on maximizing value for all creditors and slowing down and managing the skyrocketing costs of litigation. Absent a bankruptcy filing and approval of the Operational Motions, as detailed below, the Debtor would run out of cash shortly after the Petition Date.

28.     Ultimately, the Debtor envisions reorganizing, not liquidating, by the consummation of a plan of reorganization in this Chapter 11 Case, under which the Debtor would emerge free of the significant cash burn caused by the Probate Administrator's litigation campaign and with a consummately low ongoing cash need, so that the Debtor's portfolio of nascent companies have the opportunity to develop and provide long term capital growth to the Debtor and its interest holders, consistent with its original mission.[12]  I believe that the current management team, with its long standing, strong relationships with the creditors and interest holders, and extensive knowledge of the operations and industries of the Debtor's portfolio companies are the only people positioned to consummate such a plan.[13]

### IV. SUMMARY OF THE OPERATIONAL MOTIONS

29.     In order to ensure a smooth transition of the Debtor's business operations into chapter 11, the Debtor has requested certain relief by the two Operational Motions filed

---

[12] Without the current volume of litigation Debtor's ongoing cash needs are quite low, giving Kettner the opportunity to be more selective as to the timing and speed of the sale of its portfolio companies. In addition, Kettner would have the opportunity to seek other investments if advisable. Debtor was never intended to be a liquidating limited liability company, but rather a long-term equity investor seeking maximum capital growth.

[13] All three of the Debtor's managers have extensive experience overseeing the affairs of the portfolio companies, and Dr. Scott and Mr. Huemoeller have sat on a variety of other public company boards during their long careers. For his part, Dr. Titus is a world-renowned spokesperson for MJNA with extensive knowledge in hemp-related products, and has a background in finance from his days in institutional bond trading.

concurrently with this Declaration.  A summary of the relief sought in each Operational Motion, as well as the factual basis for each Operational Motion, is set forth below.

30.     I have reviewed each of these Operational Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the Operational Motions: (i) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its anticipated trajectory in this case; and (ii) is in the best interests of the Debtor and its stakeholders.

**A. Cash Collateral Motion**

31.     In the ordinary course of its business, the Debtor routinely sells certain securities held by the Debtor in certain non-debtor entities, including shares of MJNA (shares thereof, the "MJNA Stock" and, collectively with the shares of AXIM and KLFE, the "Debtor Owned Securities").

32.     During the period immediately preceding the Petition Date, the Debtor primarily sold shares of MJNA Stock (and not shares of the other portfolio companies for business reasons, including that such companies were not yet at a point of development where the Debtor desired to sell the securities it holds therein).  It is my understanding that, under applicable law, because the Debtor is considered an "affiliate" of MJNA pursuant to Rule 144(a)(1) of the 1933 Securities Act,  sales by the Debtor of MJNA Stock are subject to certain limitations pursuant to, inter alia, section 78j of the Securities Act of 1934, Rule 144 under the Securities Act of 1933, and Rules 10b 5 and 10b5-1 under the Securities Act of 1934.   Specifically, I am advised that the Debtor may only sell MJNA Stock consistent with the terms of a "written plan for trading

securities" under Rule 10b5-1(c)(1)(i)(A)(3) (the "DRIP Plan"). 1934 Act Regulation, 17 C.F.R. § 240.10b5-1(c)(1)(i)(A)(3).

33. The Debtor's current DRIP Plan was entered into on January 13, 2020, as between the debtor and Wilson-Davis & Co., Inc., the Debtor's agent for selling purposes. Under the DRIP Plan, an amount of MJNA Stock equal to 1% of MJNA's total outstanding shares—or, as of the date hereof, approximately 36 million shares of MJNA Stock—must be sold by the Debtor at recurring 90 day intervals. As of June 30, 2020, MJNA reported that there were approximately 3,866,316,936 total shares of MJNA Stock outstanding. Accordingly, under the current DRIP Plan, the Debtor may sell no more than approximately 38 million shares of MJNA Stock every 90-days.. Finally, the DRIP Plan provides that WDCO is to cease selling stock upon notice of the commencement of the bankruptcy by the Debtor, see DRIP Plan, § C.2(d); however, I believe it is in the best interest of the estate to direct WDCO to continue its brokerage activities, notwithstanding this provision.

34. Specifically, I understand that, under applicable law, suspending or otherwise delaying the "amount, price, or timing" of the sale of MJNA Stock contemplated by the DRIP Plan may render the sale of the MJNA Stock under the DRIP Plan—including all past and future sales of the MJNA Stock—impermissible by rendering the DRIP Plan ineligible for the affirmative defense set forth in SEC Rule 10b5-1(c) or impracticable from the perspective of avoidance of disruption of an orderly market in MJNA stock.

35. Thus, I believe that the orderly continuation of the Debtor's efforts to preserve assets and maximize the value of its estate is largely dependent upon its ability to regularly use cash collateral. Without the liquidity provided by use of cash collateral, the Debtor's objective

of maintaining the value of its assets for the benefit of its creditors will fail without a fair opportunity to achieve the purposes of the chapter 11 process.

36. Absent authority to use cash collateral, I believe the Debtor, its creditors, and the Debtor will be forced to immediately cease conducting business, possibly rendering the Debtor unable to use the cash proceeds of sales pursuant to the DRIP Plan, which in turn will harm the Debtor, its creditors and its members in that, among other reasons, such sales may not later be made up due to applicable securities laws and regulations. Thus, access to cash collateral is absolutely necessary to preserve and maximize value for the benefit of all of the Debtor's stakeholders.

37. Without access to this liquidity, I believe that the Debtor's ability to navigate through the chapter 11 process will be jeopardized, to the detriment of all of the estate's stakeholders.

38. In consultation with Mr. Huemoeller as Chairman of the Executive Committee and Debtor's accountant, I have prepared a cash flow and operating budget ("Budget"). As demonstrated by the Budget, the Debtor has sufficient cash on hand or anticipated cash flow to continue to pay expenses, such as management fees, professionals, and other costs associated with ongoing operations without an immediate need for additional short-term financing beyond use of cash collateral. The Budget contains categories of anticipated disbursements during the time period that the Budget covers. The Debtor believes that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with this Chapter 11 Case. Without the use of its cash collateral, as provided in the Budget, the Debtor will be unable to fund this case.

**B. Cash Management Motion**

39. In the ordinary course of its business, the Debtor maintains a cash management system (the "Cash Management System") that is commensurate with its relatively simple operational activities and cash disbursements. The Debtor uses its Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.

40. The Debtor operates a simple cash management system (the "Cash Management System") that is tailored to meet the Debtor's unique needs.  As of the Petition Date, the Debtor maintains one operating bank account (the "Operating Account") at Chase Bank ("Chase").  In addition, the Debtor has one active brokerage account (the "Brokerage Account") with Wilson-Davis & Co., Inc. ("Wilson-Davis"), through which it sells shares of MJNA stock.  Lastly, Guy Street Financial Corporation and MM Holdings LLC each maintain a control account—for the benefit of TL-66 that hold certain *de minimis* amounts of the Debtor's cash (the "Control Accounts"[14] and with the Operating Account and the Brokerage Account, the "Bank Accounts") at Wells Fargo Bank ("Wells Fargo" and with Chase and Wilson-Davis, the "Banks").  The Debtor uses its Cash Management System in the ordinary course to transfer and distribute funds through the Banks and Bank Accounts.  The Debtor incurs certain fees and charges in connection with the ordinary course of operations (collectively, the "Bank Fees").  Pursuant to this Motion, the Debtor requests authority to continue to use its Cash Management System in place as of the Petition Date and to honor and pay applicable Bank Fees in the ordinary course of business, including Bank Fees prior to the Petition Date.

---

[14] The Control Accounts are used by TL-66 to perfect its lien against the Debtor's assets.  Because the Control Accounts are not in the name of the Debtor, the Debtor intends, with TL-66's consent, to consolidate the Control Accounts with its Operating Account.

41. The Debtor utilizes preprinted business forms in the ordinary course of its business (including, without limitation, letterhead and checks) (collectively, the "Business Forms"). In connection with its chapter 11 case, the Debtor would be required by the U.S. Trustee under the *U.S. Trustee's Operating Guidelines for Chapter 11 Cases* (the "U.S. Trustee Guidelines") to incur the expense and delay of ordering entirely new business forms referencing the Debtor's status as debtor in possession absent relief from the Court. The Debtor requests that it be authorized to use its pre-existing Business Forms without such a reference in order to minimize expense to the estate.

42. I believe that it is critical that the Debtor continues to utilize its existing Cash Management System without disruption and believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtor's estate and its creditors.

Pursuant to 11 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true to the best of my information, knowledge and belief.

James R. Arabia
Chief Restructuring Representative
KETTNER INVESTMENTS, LLC